# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JASON THOMAS,

       Petitioner,                      Case No. 17-cv-10951
                                               Hon. Matthew F. Leitman

v.

RANDALL HAAS,

       Respondent.

_____/

## OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS (ECF No. 1), (2) DENYING CERTIFICATE OF APPEALABILITY, AND (3) GRANTING LEAVE TO PROCEED ON APPEAL *IN FORMA PAUPERIS*

Petitioner Jason Thomas is a state prisoner in the custody of the Michigan Department of Corrections. He is serving a sentence of twenty to thirty years for assault with intent to commit murder, Mich. Comp. Laws § 750.83, imposed following a jury trial in the St. Clair County Circuit Court.

On March 27, 2017, Thomas filed a petition for a writ of habeas corpus in this Court pursuant to 28 U.S.C. § 2254. (*See* Pet., ECF No. 1.) He raises twenty-four grounds for relief. The Court has carefully reviewed the petition and concludes that Thomas is not entitled to relief. Therefore, the Court **DENIES** the petition. The Court further **DENIES** Thomas a certificate of appealability, but it **GRANTS** him leave to proceed *in forma pauperis* on appeal.

# I

## A

The Michigan Court of Appeals described the facts underlying Thomas's convictions as follows:

> Defendant lived with his girlfriend, [Priscilla] Pompper, in a house in Port Huron. The home was a single-family residence that was transformed into two separate apartment units. Each unit had its own door leading to the outside, but there also was an internal, "common" door that connected the two units. At the time of November 5, 2011, defendant and Pompper lived in the rear unit, number 2, and Amber Samson and her brother, Max Samson (Max), lived in the front unit, number 1.
>
> On November 5, 2011, defendant, Pompper, Brooke Fox, and Jeremy Robinson, were all present at the number 2 apartment in the living room. Fox and Robinson started arguing that evening, and Pompper had told Robinson that he and Fox were to leave. Defendant took exception to this and became very angry with Pompper. According to Pompper, defendant "jumped off the couch" and said, "[D]on't tell my mother f* * *ing friends they had to leave my house[!]" Defendant then jumped on Pompper and began repeatedly stabbing her with a 3-inch Winchester knife. Initially, defendant stabbed Pompper around the neck area and then proceeded to stab her in the neck, chest, shoulder, abdomen, thigh, hands, and forearms. All told, Pompper was stabbed 17 or 18 times.
>
> In the front apartment, Max Samson was home along with two other individuals, Andrew Mackey and Johnny Cox. … Max testified that on November 5, 2011, he heard "bone chilling" screaming coming from apartment 1. He then forced open the locked common door separating the two apartment units. After walking in, Max was able to look into the living room, and he saw Pompper laying on the couch and defendant over top of her, stabbing her with a knife. Max saw defendant make three quick "jabs" with the knife before defendant turned to Max and said,

"What's good. Do you want some too?" Fearing being attacked, Max, Mackey, and Cox retreated into the first apartment. After Max saw defendant leave, he re-entered apartment 2 and helped Pompper walk through both apartments to the front porch. While he waited for EMS to arrive, Max "held" her wounds to help prevent bleeding. When police arrived, Max, Mackey, and Cox all cooperated with them. Officer Ryan Mynsberge, who was the first to respond to the 911 call, noted that there were no visible injuries on Cox, Mackey, or Max.

At trial, defendant testified and claimed that he acted in self-defense and described the following details. Defendant admitted that he got upset when Pompper asked Robinson and Fox to leave the apartment. Defendant stated that this led to "more aggressive" arguing between him and Pompper and that he grabbed Pompper by the arm, hit her a few times, and yanked on her hair. According to defendant, Pompper then demanded that defendant leave immediately. Defendant testified that he wanted to get his clothes and belongings before leaving, but Pompper called for Johnny Cox to come over from the adjacent apartment to throw defendant out. Defendant then decided to block the front door to the apartment to prevent Cox from entering. However, Cox and three other men kicked the front door in, and they all entered. After fighting for a minute, one of the men[1] pulled a gun. In response, defendant pulled a knife. Pompper then (unsuccessfully) attempted to get the knife from him. The man with the gun also approached and tried to get the knife, but defendant stabbed him multiple times in the arm, chest, and stomach areas.[2] Then, Pompper exclaimed that she had a knife too, so defendant turned to her and stabbed her "a couple" times. After that, all four men rushed defendant, and defendant "snapped," went into a panic, and stabbed Pompper further with the knife. Defendant clarified that he never actually saw Pompper with a knife; he just saw her reaching for one. Defendant left the house, but he did not remember how he was able to escape from the four men who were charging him. During this entire episode, defendant suffered no injuries. After running away for a bit, defendant threw the knife toward a house. On cross-examination, defendant admitted that this was

the first time he mentioned the presence of a gun to any government official. He also stated that he did not recall specific instances of him stabbing Pompper, but he did not deny stabbing her all those times.

The knife used in the attack was found in a back yard, several houses away. Lab testing revealed that the DNA from the dried blood on the blade matched Pompper's DNA.

The officer in charge, Detective Christopher Frazier, testified that during a subsequent search of defendant's apartment, the police found two steak-type knives: one was under a couch cushion and the other was actually underneath the couch itself in the living room. These two steak knives and the Winchester knife were tested for fingerprints and came back negative. Also found at the apartment was a black stocking cap. Pompper testified that defendant owned a black stocking cap. But before trial, defendant sought to have DNA testing conducted on the cap because he claimed that one of the four individuals who attacked him left the cap behind. The trial court denied the request because there was no evidence to suggest that the cap was related to the events that took place on November 5, 2011.

Doctors testified that the most life-threatening injury was the one to Pompper's neck, which was three inches long. The knife to the neck missed major arteries by a mere fraction of a centimeter. If it had not, Pompper would have bled to death before EMS arrived. The other injuries to her chest and abdomen also had the potential to be fatal. In addition, there was evidence that many of Pompper's wounds "clearly" were defensive. Of note, the stabbing of Pompper's arm was so forceful that it broke both bones in her forearm, in "at least two or three different areas."

After the conclusion of the three-day trial, the jury rejected defendant's claim of self-defense and found him guilty of assault with intent to murder.

*People v. Thomas*, 2014 WL 198817, at ** 1-3 (Mich. Ct. App. Jan. 16, 2014).

**B**

Prior to trial, Thomas' appointed counsel, Ronald Kaski, moved to withdraw. *See id.* at \*2. Kaski told the state court that he had substantial difficulties communicating with Thomas. *See id.* Thomas told the court that these difficulties arose from Kaski not filing motions Thomas wanted him to file. *See id.* The trial court granted the motion to withdraw and appointed Thomas substitute counsel. *See id.* That substitute counsel, Donald Sheldon, also later moved to withdraw due to numerous difficulties with Thomas including a grievance that Thomas filed against him. *See id.* The trial court denied Sheldon's motion to withdraw on the ground that Thomas's behavior would result in difficulties with any appointed attorney. *See id.*

Thomas was tried by a jury in the St. Clair Circuit Court. He was convicted of assault with intent to murder and, on September 12, 2012, sentenced to twenty to thirty years' imprisonment.

Thomas filed an appeal of right in the Michigan Court of Appeals, raising four claims through counsel and four claims in a *pro per* supplemental brief (these claims are raised as claims I through VIII in Thomas's current habeas petition). The Michigan Court of Appeals affirmed Thomas's conviction. Thomas raised these claims in an application for leave to appeal in the Michigan Supreme Court, and that court denied leave to appeal. *See People v. Thomas,* 849 N.W.2d 358 (Mich. 2014).

Thomas then filed a motion for relief from judgment in the state trial court. He raised sixteen claims (claims IX-XXIV in Thomas's habeas petition). The trial court denied the motion. (*See* ECF No. 8-18.) The Michigan Court of Appeals denied leave to appeal, *People v. Thomas*, No. 330027 (Mich. Ct. App. Nov. 30, 2016), and the Michigan Supreme Court did the same. *See People v. Thomas,* 887 N.W.2d 397 (2016).

Thomas then filed this habeas petition. (*See* Pet., ECF No. 1.) He brings the following claims for relief:

> I. Where Petitioner had filed a grievance against his lawyer and reported breakdowns in the attorney-client relationship, Petitioner's conviction should be reversed where the circuit judge failed to inquire adequately into the breakdown in the relationship and the constitutional right to counsel, and abused her discretion in denying counsel's motion to withdraw.
>
> II. The trial court violated Petitioner's constitutional right to present a defense by prohibiting the defense from having potentially exculpatory evidence test for DNA.
>
> III. A. Petitioner was denied a fair trial where a detective testified that Petitioner was on parole.
>
> B. Defense trial counsel was constitutionally ineffective in failing to move for a mistrial after the officer-in-charge of the case testified that Petitioner was on parole.
>
> IV. The prosecution submitted insufficient evidence to convict Petitioner of assault with intent to commit murder and his conviction violates his state and federal constitutional rights to be free of conviction in the absent of proof beyond a reasonable doubt.

V. Petitioner was denied a fair trial, Petitioner's constitutional right of due process of law and equal protection has been denied, Petitioner's right to confront and cross-examine was denied due to the destruction of officer's rough notes, and the court's abuse of discretion ordering disclosure of only one rough note.

VI. Petitioner's state and federal constitutional right of effective assistance has been denied. Defense attorney's [performance] fell below an objective standard of reasonableness in which Petitioner was so prejudiced that he was denied a fair trial and the reasonable probability exists that but for both counsels' conduct a different result would have occurred.

VII. Petitioner was denied his constitutional right of due process and equal protection; information is omitted from transcripts, making the record insufficient impeding on Petitioner's constitutional right of appeal.

VIII. Petitioner's constitutional right to due process of law was denied, the failure of the prosecutor to correct testimony of the witness which he knew to be false denied petitioner due process of law in violation of the Fourteenth Amendment.

IX. Petitioner's VI Amendment constitutional right to effective assistance of appellate counsel has been denied where counsel failed to raise ineffective assistance of trial counsel for failing to request the trial court to order and appoint an expert witness to test all forensic evidence collected at the crime scene.

X. Both trial attorneys were ineffective for failing to obtain testing on blood evidence that was collected at the actual crime scene.

XI. Petitioner was denied his due process of law and equal protection of law under the XIV Amendment by the prosecutor's failure to investigate.

XII. Petitioner was denied his VI Amendment right to confront and his XIV Amendment right of equal protection for the prosecutor's suppression of witness statements.

XIII. Petitioner was denied a fair and impartial trial due to the prosecutor's knowingly use of false and perjured testimony to obtain a conviction and the prosecutor's failure to correct false testimony.

XIV. Petitioner was denied his VI Amendment right to the effective assistance of counsel due to defense attorney's failure to attack witness credibility and failure to impeach.

XV. Petitioner's VI Amendment right to the effective assistance of counsel was denied due to counsel's failure to present to the jury proven facts, testimony, and facts that were favorable to the defense in closing statements; defense counsel failed to present an effective closing argument.

XVI. Petitioner's VI Amendment right to the effective assistance of counsel was denied due to counsel's failure to impeach the alleged victim.

XVII. Petitioner was denied his Fourteenth Amendment right to a fair trial, due to the trial court's error of not allowing testimony or striking the testimony of the alleged victim admitting to a specific violent act against Petitioner in a self-defense defense where the alleged victim testified to previously pulling a gun and pointing it at Petitioner.

XVIII. The prosecutor obtained conviction based upon perjured testimony; the prosecutor committed misconduct by knowingly allowing Pompper to commit perjury.

XIX. The prosecutor obtained conviction based upon perjured testimony; the prosecutor committed misconduct by knowingly allowing state witnesses to commit perjury.

XX. Petitioner was denied a fair and impartial trial guaranteed under the Fourteenth Amendment, due to the

prosecutor's misconduct of failure to address a prior threat made against petitioner by the alleged victim in a case of self-defense as a defense.

XXI.    Petitioner's Sixth Amendment right to the effective assistance of counsel was denied due to trial counsel's failure to address a prior threat the alleged victim made against Petitioner three days previous to the instant incident, the alleged victim threatened Petitioner with a knife.

XXII.    Petitioner's due process rights were violated due to the prosecutor's suppression of evidence.

XXIII. The prosecutor committed misconduct by knowingly obtaining a conviction on perjured testimony. The prosecutor failed to correct perjured testimony.

XXIV. The prosecutor committed misconduct due to: noncompliance of a court order; failure to investigate; suppression of evidence; and for not testing evidence that the court ordered to be tested.

## II

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires federal courts to uphold state court adjudications on the merits unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "The question under AEDPA is not whether a federal court believes the state court's

determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

## III

## A

Thomas's first claim arises out of the state trial court's refusal to allow his second appointed counsel, Sheldon, to withdraw. Thomas argues that the trial court abused its discretion when it denied Sheldon's motion because Thomas had filed a grievance against Sheldon citing a breakdown in the attorney-client relationship and because the trial court had failed to inquire adequately into the breakdown of that relationship.

The Michigan Court of Appeals considered this claim on direct review and rejected it:

> When reviewing a trial court's decision to deny a defense counsel's motion to withdraw, this Court considers the following factors:
>
> (1) whether the defendant is asserting a constitutional right, (2) whether the defendant has a legitimate reason for asserting the right, such as a bona fide dispute with his attorney, (3) whether the defendant was negligent in asserting his right, (4) whether the defendant is merely attempting to delay trial, and (5) whether the defendant demonstrated prejudice resulting from the trial court's decision. [Echavarria, 233 Mich.App at 369.]
>
> Even though defendant asserted a constitutional right, the trial court's decision to deny the request did not fall outside the range of reasonable and principled outcomes. Most

importantly, the second factor weighs strongly against granting the motion because there was no "legitimate" reason for requesting new counsel. It is well established that a defendant cannot "purposefully break down the attorney-client relationship by refusing to cooperate with his assigned attorney and then argue that there is a good cause for a substitution of counsel." *Traylor*, 245 Mich.App at 462–463 (quotation marks omitted). Defense counsel Sheldon explained in his motion and at the hearing that defendant notified him that he wanted certain witnesses subpoenaed. As a result, Sheldon met with defendant, but "part way through this conference, Defendant stated that 'you're just trying to obtain information and not doing what I want and need done.'" Defendant then refused to provide any further information and walked out of the meeting. Sheldon also noted that before that meeting, defendant previously would refuse to discuss the legal merit for any of defendant's other suggested courses of action. The above interactions display an unreasonable and irrational behavior on defendant's part. To fail to purposely cooperate with appointed counsel is no reason to appoint new counsel. *Id.* As the trial court noted, being that this was defendant's second appointed counsel, there was nothing to indicate that this type of behavior would not continue regardless of who was appointed counsel. Consequently, because any impediment in the attorney-client relationship was purposely and unreasonably imposed by defendant, there is not a legitimate or bona fide reason to appoint new counsel, and the trial court did not abuse its discretion in denying Sheldon's request to withdraw.

*Thomas*, 2014 WL 198817, at *3.

The Michigan Court of Appeals' decision was not contrary to, or an unreasonable application of, clearly established federal law. The Sixth Amendment guarantees an accused the right to the effective assistance of counsel in his defense, and gives an indigent criminal defendant the right to the assistance of court-appointed counsel. *See Gideon v. Wainwright*, 372 U.S. 335, 343 (1963). However,

the Sixth Amendment does not guarantee "that a defendant will inexorably be represented by the lawyer whom he prefers," *Wheat v. United States*, 486 U.S. 153, 159 (1988), nor does it guarantee a "meaningful relationship" between an accused and his counsel, *Morris v. Slappy*, 461 U.S. 1, 14 (1983). Moreover, a criminal defendant may not "stop the criminal justice system in its tracks" by rejecting counsel for no justifiable reason, *Swiger v. Brown*, 86 F. App'x 877, 882 (6th Cir. 2004), or create "'indefinite delays while he tries on new lawyers unless he has a reason for dissatisfaction with the old.'" *King v. Bobby*, 433 F.3d 483, 493 (6th Cir. 2006) (quoting *U.S. v. Oreye*, 263 F.3d 669, 671 (7th Cir. 2001)). Thomas has not shown that the Michigan Court of Appeals' decision that he had failed to raise any justifiable reason for replacing his second-appointed counsel was unreasonable under these circumstances.

Thomas's claim that the state trial court failed to conduct a meaningful inquiry into the reasons underlying the motion to withdraw also does not warrant relief. Thomas has not identified any clearly established federal law from the Supreme Court requiring a court to inquire into the nature of a defendant's dissatisfaction with counsel before denying a motion for substitution of counsel. *See James v. Brigano*, 470 F. 3d 636, 643 (6th Cir. 2006) (reversing grant of habeas relief because petitioner failed to identify any clearly established federal law requiring inquiry).

For all of these reasons, Thomas is not entitled to federal habeas relief on this claim.

B

In Thomas's second claim, he argues that the state trial court violated his right to present a defense when it denied his request for DNA testing on following items: a stocking cap, a coat, and two steak knives.[1] The Michigan Court of Appeals considered this claim on direct review and rejected it:

> At the outset, to the extent that defendant argues that the trial court should have ordered DNA testing on the two steak knives and a coat that purportedly were found at the apartment, there is no plain error. Defendant did not request that these articles be subjected to DNA testing, and he does not provide any authority that would require a trial court to sua sponte order such testing. In fact, with respect to these items, defendant only requested fingerprint testing be done on the knives, and that testing was conducted. Accordingly, defendant has not established any error, plain or otherwise, and is not entitled to relief on these issues.

> However, defendant did request that a stocking cap that was found at the apartment be tested for DNA, and the trial court expressly denied that request. Defendant's theory was that the cap was worn by one of the assailants that attacked him and that DNA testing would corroborate his version of events. However, defendant failed to establish how even if DNA testing did indicate that someone other than defendant or Pompper

---

[1] Respondent argues that Thomas procedurally defaulted this claim with respect to the coat and two steak knives because he never requested that these items be tested. Because the underlying merits of this claim are easily resolved, the Court will address the merits. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

> wore the hat, how that makes it more likely that defendant's
> testimony was true. That hat could have been left there by
> someone else days or even weeks before the incident occurred.
> In short, there was nothing on the record to indicate that the cap
> itself was related in any way to the events that unfolded on
> November 5, 2011. Accordingly, because the relevance of any
> such DNA results was negligible, the trial court did not abuse
> its discretion in failing to order the additional testing.

*Thomas,* 2014 WL 198817, at *4.

The Court of Appeals' ruling was not contrary to, or an unreasonable application of, clearly established federal law. The Sixth and Fourteenth Amendments guarantee criminal defendants a meaningful opportunity to present evidence in support of a complete defense. *Crane v. Kentucky*, 476 U.S. 683, 689–690 (1986). But the right to present a defense is subject to reasonable restrictions. For instance, a court may properly exclude irrelevant evidence. *See United States v. Scheffer*, 523 U.S. 303, 308 (1998) (*citing Rock v. Arkansas*, 483 U.S. 44, 58 (1987)); *Taylor v. Illinois*, 484 U.S. 400, 424 (1988). Thomas's right to present a defense was not violated with respect to the knives and coat because he did not request DNA testing of these items. The stocking cap was found at the scene of the stabbing, but, beyond that, Thomas has not shown any unreasonableness in the state court's conclusion that testing the cap would have failed to yield relevant and material exculpatory evidence. Nor has Thomas shown that the results of any DNA test on any of these items supported his defense of self-defense.

For all of these reasons, Thomas is not entitled to federal habeas relief on this claim.

C

Thomas's third claim for habeas relief arises out of the trial testimony of police detective Christopher Frazier. Thomas argues that Frazier violated his (Thomas's) right to a fair trial when Frazier testified that Thomas was on parole at the time of the stabbing. Frazier, when asked to explain the efforts used to locate Thomas after he was identified as the suspect, testified as follows:

> [W]hen we exhausted all the local leads, um, I re-interviewed the, the victim in this case to find out, you know, where else, what have we missed, where else could [defendant] have gone to. And, um, I was supplied some information about other possible locations California, Tennessee, and the most probable one was a brother in the Battle Creek area.

> Um, I got a name and was told he was on parole. Um, made contact with the parole department in Calhoun County, dealt with an Agent Sutton and, um, through coordinated efforts with Agent Sutton I spoke with a, they have a special police unit for the Battle Creek police department that works in conjunction with the parole department. And they were able to do a parole check and during that parole check they made the arrest of [defendant].

*Thomas*, 2014 WL 198817, at *5.

The Michigan Court of Appeals considered this claim on direct review and rejected it. It held that Frazier was referring to Thomas's brother being on parole, not Thomas himself:

The detective's statement, "I got a name and was told he was on parole" makes it clear that he was referring to someone other than defendant. First, the sentence was just a continuation of the detective's discussion related to defendant's "brother in the Battle Creek area."[3] Thus, a natural understanding is that the non-specific terms "a name" and "he" referred to the last person mentioned, which was defendant's brother. Second, there is no doubt that the police already knew defendant's name at this time. Thus, it makes no sense for Detective Frazier to say "I got a name and was told he was on parole" if he was referring to defendant. Therefore, when viewed in context, contrary to defendant's claim, it is clear that Detective Frazier did not allege that defendant had a criminal history and was on parole at the time of this crime. Accordingly, defendant has failed to establish how he was denied a fair trial by virtue of the jury being informed that his brother was on parole at the time of the crime.

—————————————

[3] The fact that the court reporter decided to inject a paragraph break between these two sentences in the transcript does not control our analysis.

*Id.* at *5.

The Michigan Court of Appeals' decision was not contrary to, or an unreasonable application of, clearly established law. The state court's interpretation that Detective Frazier was referring to Thomas's brother and not Thomas himself has at least some support in the record. In any event, even if Frazier was referring to Thomas's parole status, Thomas has still not shown he is entitled to habeas relief. Thomas has not identified any clearly established Supreme Court precedent that would have precluded admission of evidence that he was on parole.

For all of these reasons, Thomas is not entitled to federal habeas relief on this claim.

## D

In Thomas's fourth claim, he challenges the sufficiency of the evidence presented to support his conviction for assault with intent to murder. Under Michigan law, the elements of assault with intent to commit murder are: (1) the defendant committed an assault; (2) with an actual intent to kill; and (3) which, if successful, would make the killing murder. *See Thomas*, 2014 WL 198817, at *6. Thomas contends that the evidence presented was insufficient to prove the second element – that he had the intent to kill.

The Michigan Court of Appeals considered this claim on direct review and rejected it:

> "The intent to kill may be proved by inference from any facts in evidence." *People v. Jackson*, 292 Mich.App 583, 588; 808 NW2d 541 (2011). And because of the difficulty of proving an actor's state of mind, only minimal circumstantial evidence of intent to kill is sufficient. *People v. McRunels*, 237 Mich.App 168, 181; 603 NW2d 95 (1999). The intent to kill can be inferred from the manner of use of a dangerous weapon. *People v. Dumas*, 454 Mich. 390, 403; 563 NW2d 31 (1997).

> In the instant case, defendant admitted at trial to stab[b]ing Pompper with a knife. Thus, there is no question that his actions with the dangerous weapon were intentional. But his claims that he only intended to seriously harm Pompper are not availing because the evidence was nonetheless sufficient for a jury to conclude beyond a reasonable doubt that he intended to kill her. First, there was evidence that defendant stabbed

Pompper 17 or 18 times all over her body. Additionally, the wounds were particularly gruesome, where one of the doctors testified that he had never seen "fileting [sic] of skin like that ever." The doctor explained that they normally do not close stab injuries due to infection concerns, but because of the "large filets of tissue" they had to close these injuries, otherwise Pompper would have had "ten centimeter gaps of skin." It is established that violence and multiple wounds resulting from an attack can support a finding of intent to kill. *People v. Hoffmeister*, 394 Mich. 155, 160; 229 NW2d 305 (1975). Moreover, the surgeon testified that many of the stab wounds were potentially fatal, including the ones on Pompper's neck, which missed vital arteries by mere millimeters. If the strikes [had] landed slightly in a different place, then Pompper would have bled to death before EMS arrived. Slashing or stabbing someone in such an obvious vital area is evidence of an intent to kill. *See People v. Ericksen*, 288 Mich.App 192, 196; 793 NW2d 120 (2010); *People v. Drayton*, 168 Mich.App 174, 177; 423 NW2d 606 (1988).

Therefore, when viewing all of the evidence in a light most favorable to the prosecution, the jury could have concluded beyond a reasonable doubt that defendant had the requisite intent to kill when he attacked Pompper, and defendant's claim on appeal fails.

*Thomas*, 2014 WL 198817, at ** 6-7.

The Michigan Court of Appeals' decision was not contrary to, or an unreasonable application of, Supreme Court precedent. On habeas review, a sufficiency of the evidence inquiry involves "two layers of deference": one to the jury verdict, and a second to the Michigan Court of Appeals' decision. *Tanner v. Yukins*, 867 F.3d 661, 672 (6th Cir. 2017). First, the Court "must determine whether, viewing the trial testimony and exhibits in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009), (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in *Jackson*)). Second, if the Court were "to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, [the Court] must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Id.*

Here, Thomas has not satisfied this two-level standard of review. Most importantly, he has not made any particularized showing as to how the evidence was insufficient. Instead, he generally asserts that "at most" the prosecution showed an intent to "inflict great bodily harm less than murder." (*See* ECF No. 1-1, PageID.113.) But the jury was free to infer a greater intent from the number and severity of Pompper's wounds. The jury also did not credit Thomas's claims of self-defense. These credibility determinations are within the province of the jury.

For all of these reasons, Thomas is not entitled to federal habeas relief on this claim.

## E

Thomas's fifth claim concerns the alleged destruction of evidence. He claims that the prosecution possessed "rough notes" arising out of the police investigation that were never disclosed to the defense. He argues that the failure to disclose, and

possible destruction of, the rough notes violated his right to present a defense under *Brady v. Maryland*, 373 U.S. 83 (2005), his right of confrontation, and right to due process.

The Michigan Court of Appeals considered this claim on direct review and rejected it. It found no evidence that any "rough notes" existed that were not turned over to the defense. *Thomas*, 2014 WL 198817, at *7. The court further noted that Thomas's argument to the contrary was based upon "unsupported speculation and supposition." *Id.* Finally, the Michigan Court of Appeals found nothing in the record to indicate that even if other rough notes existed, those notes would have been favorable to the defense or that the notes were intentionally destroyed. *See id.*

The Michigan Court of Appeals' decision was not contrary to, or an unreasonable application of, clearly established federal law. As the Michigan Court of Appeals correctly pointed out, Thomas's arguments are based upon speculation and unsupported inferences. He has neither presented sufficient evidence that these notes existed nor that if they did exist that they would have been favorable to his defense. Simply put, Thomas has not presented adequate evidence related to these notes to survive AEDPA's deferential standard of review.

For all of these reasons, Thomas is not entitled to federal habeas relief on this claim.

**F**

In Thomas's next several claims, he raises multiple alleged examples of the ineffective assistance of counsel. On direct appeal, he raised 17 ineffective assistance of counsel claims (habeas claims VI.A. through Q). He raised six additional ineffective assistance of counsel claims in his motion for relief from judgment (habeas claims X, XIV, XV, XVI, and XXI). Many of these claims are overlapping or related. The Court will analyze the claims in the following groups: (1) failures related to forensic testing, discovery, and discovery requests; (2) failures related to testing witness credibility and objecting to other testimony at trial; (3) inadequacy of his counsel's closing argument; and (4) the failure to elicit testimony that Pompper threatened Thomas with a knife a few days before the stabbing.

An ineffective assistance of counsel claim has two components. A petitioner must show that counsel's performance was deficient and that the deficiency prejudiced the defense. *See Strickland v. Washington,* 466 U.S. 668, 687 (1984). Under AEDPA, the standard for obtaining relief under *Strickland* is difficult to meet because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (internal citations and quotation marks omitted).

The Michigan Court of Appeals did not separately address each of Thomas's ineffective assistance of counsel claims; instead, it denied some of them in summary

fashion. The Court accords these summary denials deference under AEDPA. Where a state court denies a claim on the merits, but without explanation, "a habeas court must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with [Supreme Court precedent]." *Harrington*, 562 U.S. at 102.

## 1

Thomas raises numerous claims related to defense counsel's handling of evidence and discovery matters (such as the failure of his counsel to have the DNA from the stocking cap tested). He asserts that both defense attorneys (Kaski and Sheldon) were ineffective when they failed to ask the state trial court to test "'all' of his own evidence that was collected at the crime scene for its exculpatory nature and value" and failing to move for an expert to perform testing. (*See* ECF No. 1-1, PageID.133.) The Michigan Court of Appeals considered this claim on direct review and rejected it:

> This claim necessarily fails because defendant did not establish what the results of any further testing would have been and how it would have altered the jury's verdict. More to the point, any results would have had no bearing on defendant's claim of self-defense. As we discussed …, even if other items in the apartment, such as the stocking cap, contained hair from someone other than defendant or Pompper, there was nothing to link these items to the events that took place on November 5, 2011. Likewise, defendant's argument that defense counsel

should have requested an expert to test all of the forensic evidence is unavailing.

*Thomas*, 2014 WL 198817, at *9.

The Michigan Court of Appeals' decision was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Here, Thomas has failed to explain how additional testing or expert testimony would have aided his defense of self-defense or impacted the trial's outcome. His conclusory allegations of ineffective assistance of counsel with respect to the testing and testimony issues do not justify federal habeas relief. *See Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998). Thus, he is not entitled to federal habeas relief on this claim.

Thomas next asserts his counsel was ineffective when counsel failed to file motions for the "rough notes" of Thomas's interview with police and to file discovery motions drafted by Thomas. The Michigan Court of Appeals considered these claims on direct review and rejected them. It held that Thomas had failed to establish the factual predicate for his "rough notes" claim because he never established the existence of those notes and that he failed to rebut the presumption that counsel's decision not to file Thomas's motions was sound trial strategy. *See Thomas,* 2014 WL 198817 at ** 8-9. Those decisions appear to be supported by the record, and Thomas has not shown that the decisions were contrary to, or an

unreasonable application of, Supreme Court precedent. Thomas is therefore not entitled to federal habeas relief on these claims.

**2**

Thomas's next group of ineffective assistance of counsel claims arise out of his defense counsel's handling of witness credibility issues and counsel's failure to raise certain objections at trial. For example, Thomas claims that his counsel was ineffective for failing to object when Detective Frazier supposedly testified that Thomas had been on parole at the time of the stabbing. He also claims that his counsel failed to impeach Pompper when she testified falsely at trial.

The Michigan Court of Appeals considered these claims on direct review and rejected them. The court determined that most of Thomas's complaints about his counsel's performance at trial were based on Thomas's frustrations with defense counsel's failure to do exactly what Thomas wanted, including asking specific questions of witnesses and making certain objections. *See id.* at ** 5, 8. With respect to these claims, the Michigan Court of Appeals held that Thomas "failed to rebut the presumption that counsel employed sound trial strategy." *Id.* It further concluded "that the outcome if the trial would not have been different had counsel acted as defendant desired." *Id.*

The Michigan Court of Appeals' rulings on these claims were not contrary to, or an unreasonable application of, clearly established federal law. For example, with

respect to counsel's failure to object to Detective Frazier's testimony, Thomas has not shown how such an objection would have been supported by law and sustained. And with respect to Pompper's alleged false testimony, Thomas has failed to show that her trial testimony was false or that counsel's cross-examination prejudiced his defense. Nor has he sufficiently shown how the questioning he wanted would have been beneficial to the defense. Moreover, Thomas has not demonstrated that the Michigan Court of Appeals' decision to reject these claims was contrary to, or an unreasonable application of, *Strickland*.

Finally, with respect to Thomas's other ineffective-assistance claims arising out of the credibility of witnesses, he has failed to show that the witnesses gave false testimony or that the Michigan Court of Appeals' holding that his counsel was not ineffective related to that testimony was contrary to or an unreasonable application of Supreme Court precedent.

**3**

Next, Thomas complains about the effectiveness of defense counsel's closing argument. The Michigan Court of Appeals denied this claim without discussion. Nevertheless, that decision is accorded AEDPA deference. *See Harrington*, 562 U.S. at 102. Under this doubly-deferential standard of review, the Court holds that the Michigan Court of Appeals' ruling was not contrary to, or an unreasonable application of, Supreme Court precedent. Defense counsel focused on the intent

element in closing argument and reviewed the evidence presented, including Thomas's argument of self-defense. Deference to an attorney's "tactical decisions in … closing presentation is particularly important." *Yarborough v. Gentry,* 540 U.S. 1, 6 (2003). There are many different ways to craft an effective closing argument, and deciding which issues to sharpen and how to clarify those issues is a matter of trial strategy. *Id.* Thomas has failed to show that defense counsel's closing argument fell outside the wide range of competent assistance.

## 4

Finally, Thomas claims that defense counsel was ineffective for failing to elicit testimony about a prior argument between Pompper and Thomas. The Michigan Court of Appeals' summary denial of this claim was not contrary to, or an unreasonable application of, Supreme Court precedent. According to Thomas, three days before the stabbing, Pompper threatened him with a knife. But when Thomas testified at trial, he never mentioned this incident, despite being asked about his relationship with Pompper and whether he feared for his life. In addition, given his own testimony that he (not Pompper) was the first to pull a knife during their altercation and that he never saw Pompper with a knife on the day of the stabbing, Pompper's actions several days prior to the stabbing are not probative of Thomas's state of mind.

In sum, the Michigan Court of Appeals' decisions denying Thomas's ineffective assistance of counsel claims were neither contrary to, nor an unreasonable application of, clearly established federal law. Thomas's litany of complaints about counsel's representation resembles a "kitchen sink" approach. Thomas believes counsel should have taken a different approach on many, if not all, of the strategic decisions at atrial. But Thomas has failed to show his counsel's approach was not a reasonable trial strategy or that he suffered resulting prejudice. Accordingly, Thomas is not entitled to federal habeas relief on these claims.

## G

Thomas next asserts ten claims of prosecutorial misconduct (claims VIII, XI-XIII, XVIII-XX, XXII-XXIV).

Serious prosecutorial misconduct may deny a criminal defendant due process of law. *See Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000). To constitute a due process violation, a prosecutor's improper conduct must have been "so egregious so as to render the entire trial fundamentally unfair." *Id*. In addition, a prosecutor's improper comments violate a criminal defendant's constitutional rights if they "'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

**1**

First, Thomas argues that the prosecutor committed misconduct when the prosecutor failed to correct the victim's false testimony. He argues that Pompper testified falsely at the preliminary examination and at trial when she stated that Thomas stabbed her in the head and that the prosecutor never corrected allegedly-false testimony.

The Michigan Court of Appeals considered this claim on direct review and rejected it:

> [A] review of the transcript does not support defendant's position. At the preliminary examination, Pompper testified that she initially "thought" that defendant had hit her in the head but she later realized that defendant was actually stabbing her. However, when she was asked to describe specifically where she was stabbed, she did not mention her head; she only stated that she had "scratch marks" on her head "like, from a knife," but they were not deep. There is nothing in the record to indicate that this testimony was false or, even if it was, that the prosecutor knew it was false.

> The same result occurs when looking at Pompper's trial testimony. She testified that she initially thought defendant was hitting her in the head, but then realized that he "was really trying to stab though [her] head." Given that Pompper was testifying regarding what she *thought* defendant was thinking or attempting, it is impossible to show that this statement was false. Moreover, to the extent that the jury may have been confused by this testimony, Pompper later gave a detailed list of the areas that were stabbed, and she did not mention her head. Therefore, not only has defendant failed to establish that the prosecutor knowingly used any false testimony, he also cannot

establish how any alleged false testimony prejudiced him when Pompper later clarified that her head was not stabbed.

*Thomas*, 2014 WL 198817, at \*10.

The Michigan Court of Appeals' decision was not contrary to, or an unreasonable application of, clearly established federal law. The appellate court's summary of Pompper's preliminary examination and trial testimony appears to be supported in the record. And Thomas has not shown any unreasonableness in the state court's conclusion that he (Thomas) failed to show that Pompper's testimony was false. Thomas is therefore not entitled to federal habeas relief on this claim.

**2**

Respondent argues that Thomas's remaining prosecutorial misconduct claims are procedurally defaulted. Thomas did not raise these claims on his direct appeal. Instead, he raised them for the first time in a state court post-conviction motion for relief from judgment. (*See* ECF No. 8-17.) The state trial court held that those claims were subject to Michigan Court Rule 6.508(D)(3) and were defaulted unless Thomas could establish good cause and prejudice for failing to raise them on direct review. Thomas asserted ineffective assistance of appellate counsel as cause to excuse the default. The trial court addressed the merits of Thomas's ineffective assistance of appellate counsel claim and held counsel was not ineffective and thus Thomas had not shown the required good cause:

Defendant must overcome the presumption that appellate counsel's decisions regarding which claims to pursue was sound appellate strategy. While Defendant is obviously unhappy with the result of his appeal, he nevertheless bears the heavy burden of proving that appellate counsel's performance fell below an objective standard or reasonableness. … [A]ppellate counsel pursued at least six different theories of possible merit, all of which the Court of Appeals ultimately rejected. The Court presumes that appellate counsel discarded what he considered to be the weaker arguments in order to focus on the arguments he felt were more likely to prevail…

* * *

Having presided over Defendant's jury trial in this case, having reviewed the Court of Appeals' lengthy unpublished opinion from Defendant's appeal, and having review Defendant's lengthy Motion for Relief from Judgment with numerous appendi[c]es, this Court concludes that the issues appellate counsel chose to raise were the result of sound appellate strategy and were based up on appellate counsel's conclusion that these had a better chance of success than the issues currently being raised by Defendant. A Motion for Relief from Judgment is not a "do-over" for an unsuccessful appeal, and Defendant has presented no evidence to this Court that appellate counsel was constitutionally ineffective. If anything, Defendant's motion is yet another example of Defendant attempting to shift the blame to his attorney for not taking marching orders from him and refusing to raise issues on appeal that his counsel found frivolous.

Accordingly, this Court finds that Defendant has failed to overcome the presumption that he received effective assistance of appellate counsel. As such, he cannot establish the requisite good cause for not raising his current claims on direct appeal.

(ECF No. 8-18, PageID.1861-1863.) The Michigan Court of Appeals and Supreme

Court denied leave to appeal. (ECF No. 8-19, 8-20.)

Because Thomas failed to present his claims to the state court in accordance with state procedural rules, and because the state court relied on Thomas's failure to comply with those procedural rules when denying relief, these prosecutorial misconduct claims are procedurally defaulted here unless Thomas can establish either (1) cause for the default and prejudice from the alleged constitutional violation, or (2) that failure to consider the claims would result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

In this Court, Thomas argues, as he did in state court, that his appellate attorney's ineffectiveness excuses his default. *See Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. 2013) (ineffective assistance of appellate counsel may constitute cause excusing a procedural default). The state trial court's holding on collateral review that appellate counsel was not ineffective is entitled to AEDPA deference. *See Jackson v. Lafler*, 453 F. App'x 620, 623-24 (6th Cir. 2011) (applying AEDPA deference to state court's decision on ineffective assistance of appellate counsel claim where ineffective-assistance claim was raised as cause to excuse a state court procedural default). The state trial court's denial of Thomas's ineffective assistance of appellate counsel claim was not contrary to, or an unreasonable application of, Supreme Court precedent.

A petitioner does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal. *See Jones v. Barnes*, 463 U.S. 745, 754 (1983).

Indeed, appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). The prejudice standard in the context of an alleged failure to raise issues on appeal requires a showing that there is "a reasonable probability, but for counsel's unreasonable failure . . . he would have prevailed on his appeal." *Smith*, 528 U.S. at 285. To require appellate counsel to raise every possible colorable issue would "run[]the risk of burying good arguments – those that ... go for the jugular – in a verbal mound made up of strong and weak contentions." *Barnes*, 463 U.S. at 753 (quotation omitted). As briefly discussed below, the prosecutorial misconduct claims counsel excluded were weak claims without any reasonable chance of success on appeal. Therefore, the trial court's holding that appellate counsel was not ineffective was not an unreasonable application of, or contrary to, clearly established federal law.

Thomas raises several examples of the prosecutor's alleged misconduct that his appellate counsel did not raise on appeal. For example, Thomas argues that the prosecutor committed misconduct when the prosecutor failed to adequately investigate the evidence collected from the crime scene. Thomas maintains that if the prosecutor had properly tested blood collected from the crime scene, that blood evidence would have substantiated Thomas's claim that he was simply defending himself against an attack by four unidentified men at the time of the stabbing. But

there is no constitutional requirement that police or prosecutors perform particular tests or that they utilize a "particular investigatory tool." *Arizona v. Youngblood*, 488 U.S. 51, 59 (1988). Nor has Thomas shown that the refusal to test the blood was made in "bad faith." *Id.* at 56-58. Accordingly, the state court's conclusion that appellate counsel was not ineffective in omitting this claim was not unreasonable.

Next, Thomas argues that the prosecutor suppressed evidence favorable to the defense: namely Pompper's statements to police and certain drug evidence. His allegation that an undisclosed statement by Pompper existed which may have been used to impeach her trial testimony is based upon unsupported speculation. There is also no evidence that the prosecutor suppressed drug evidence. Photographs were taken of drugs and drug paraphernalia found at the home, and they were produced to the defense prior to trial. Thomas's argument that the prosecutor should have, but did not, take fingerprint evidence form the drug paraphernalia is not the same as suppressing evidence.

Thomas also raises several claims alleging that the prosecutor knowingly presented perjured testimony. At most, these claims show inconsistencies between a witness's testimony and a prior statement or physical evidence. But "mere inconsistencies" in testimony do not establish a prosecutor's knowing use of perjured testimony. *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998).

Next, Thomas argues that the prosecutor violated a court order to test the two knives found at the scene to determine whether fingerprint evidence matched Thomas, Pompper, or anyone else known to be in the apartment at the time of the stabbing. Based upon a state police laboratory report (*See* ECF No. 1-3, PageID.359), Thomas claims that the knives were only tested to determine whether Thomas's fingerprints were present, not for any other fingerprints. Thomas is wrong. The laboratory report clearly states that the evidence "was processed with no latent prints of comparison value being developed." (*Id.*) Thomas's claim that the knives were not tested is unsupported by the record.

Finally, Thomas argues that the prosecutor committed misconduct when the prosecutor failed to address the incident where Pompper threatened Thomas with a knife a few days before the stabbing. The prosecutor had no obligation to introduce this evidence.

Given the weakness (and sometimes baselessness) of these prosecutorial misconduct claims, the Court holds that the state court's denial of Thomas's ineffective assistance of appellate counsel claim was not contrary to, or an unreasonable application of, clearly established federal law. Thomas has also not presented any new reliable evidence to support an actual innocence claim to show that his claims should be considered under the fundamental miscarriage of justice

exception to procedural default. *See House v. Bell*, 547 U.S. 518, 536 (2006). Thus, these claims are procedurally defaulted.

## H

Thomas's seventh claim alleges that his right to due process was violated by critical omissions from the trial court transcripts.

The Michigan Court of Appeals considered this claim on direct review and rejected it:

> Defendant has failed to overcome the presumption that the transcripts were correct. Most importantly, defendant fails to argue with specificity any alleged inaccuracy. Instead, he simply added comments to the citations in his brief, such as "some testimony omitted form [sic] transcript, or record" and "some portions are omitted from the transcripts or record." Defendant also has not provided any independent corroboration of his claims. And our review of the transcripts did not indicate any obvious errors or omissions. Furthermore, there is nothing on the record to indicate that the court experienced any technical difficulties on the second day of trial that impeded the reporter's ability to transcribe the proceedings, as defendant alleges. The only time hand-held microphones were used on the second day of trial was when witnesses were speaking so softly that the people in the courtroom had difficulty hearing the witnesses speak. But even when this difficulty to hear arose, the transcript nonetheless reflected the hard-to-hear statements. Additionally, the court reporter provided a sworn statement certifying that the transcript was "true and complete." Accordingly, defendant failed to establish any plain error in his due-process claim.
>
> With respect to defendant's claim that only certain portions of his police interview were in the transcript, it appears that defendant is not arguing a transcription error, per se. Instead, it appears that he is arguing that only a portion of the interview

was provided at trial. This is evident because he also alleges that he voiced his own concerns about this at trial, but those concerns also were missing from the transcript. Obviously, at the time of trial, he would not have known what would and what would not be captured on a subsequent transcript . Thus, we presume he was referring to the admission into evidence of parts of his interview. As such, the issue has nothing to do with any court reporter erroneously transcribing the proceedings. Moreover, we will note that not all of defendant's statements during his police interview are admissible anyway. Only those portions introduced by the prosecution would be admissible under MRE 801(d)(2) as an admission from a party-opponent. So if defendant was expecting that all of his statements to the police should have been admitted, he is mistaken.

*Thomas,* 2014 WL 198817, at ** 9-10.

The Michigan Court of Appeals' decision was not an unreasonable determination of the facts, nor was it contrary to, or an unreasonable application of, Supreme Court precedent. Thomas disagrees with the state court's factual finding that the transcripts accurately represented the trial court proceedings, but he fails to provide any evidence other than his own recollections to rebut the state court's finding. Thomas is therefore not entitled to federal habeas relief on this claim.

## I

Finally, Thomas argues that the state trial court erred when it struck Pompper's testimony that she pulled a gun on Thomas a few months prior to the

stabbing.  The trial court held that the evidence was not relevant to Thomas's claim that he acted in self-defense.[2] (*See* ECF No. 8-13, PageID.1138.)

An evidentiary ruling may violate the Due Process Clause (and thereby provide a basis for habeas relief) where the ruling "is so extremely unfair that its admission violates 'fundamental conceptions of justice.'" *Dowling v. United States*, 493 U.S. 342, 352 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977)); *Bugh v. Mitchell*, 329 F.3d 496, 512 (2003).  The trial court's decision that an incident which occurred several months prior to the stabling was irrelevant to did not violate Thomas' due process rights.  Thomas is therefore not entitled to federal habeas relief on this claim.

## IV

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (a "COA") is issued under 28 U.S.C. § 2253.  Rule 11 of the Rules Governing Section 2254 Proceedings now requires that the Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  The substantial showing threshold is satisfied when a petitioner

---

[2] Because the underlying merits of this claim are easily resolved, the Court will not address Respondent's argument that the claim is procedurally defaulted. *See* 28 U.S.C. § 2254(b)(2).

demonstrates "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

In this case, the Court concludes that reasonable jurists would not debate the Court's conclusion that relief should be denied. Therefore, the Court denies Thomas a certificate of appealability.

The standard for granting an application for leave to proceed *in forma pauperis* ("IFP") on appeal is a lower standard than the standard for COAs. *See Foster v. Ludwick*, 208 F.Supp.2d 750, 764 (E.D. Mich. 2002) (citing *United States v. Youngblood*, 116 F.3d 1113, 1115 (5th Cir. 1997)). While a COA may only be granted if a petitioner makes a substantial showing of the denial of a constitutional right, a court may grant IFP status if it finds that an appeal is being taken in good faith. *See id.* at 764-765; 28 U.S.C. § 1915(a)(3); Fed. R. App. 24(a). "Good faith" requires a showing that the issues raised are not frivolous; it does not require a showing of probable success on the merits. *Foster*, 208 F.Supp.2d at 765.

The Court concludes that an appeal could be taken in good faith. Thomas may therefore proceed *in forma pauperis* on appeal.

**V**

For the reasons set forth above, the Court **DENIES** Thomas's petition for writ of habeas corpus (ECF No. 1).

The Court further **DENIES** Thomas a certificate of appealability, but it grants him leave to appeal *in forma pauperis*.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: March 20, 2020